**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,    ) | |
|           ) | |
|      Plaintiff,    ) | |
|           ) | |
|    v.    ) | |
|           )   Civil No.: 1:05-CV-01087 (JR) | |
| CRAIG MANSON, et al.,    ) | |
|           ) | |
|      Defendants.    ) | |
|           ) | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rules of Civil Procedure, Rule 56, Plaintiff Center for Biological Diversity respectfully moves this Court for summary judgment on its complaint. This motion is based on the accompanying memorandum of points and authorities in support of Plaintiff's motion for summary judgment, Plaintiff's statement of material facts as to which there is no genuine issue, the declaration of Kieran Mulvaney, the pleadings, and matters submitted during oral argument.

Dated: August 5, 2005

Respectfully submitted,

_Justin Augustine_

_____

Brent Plater (DC Bar No. 486505)
CENTER FOR BIOLOGICAL DIVERSITY
SAN FRANCISCO BAY AREA OFFICE
1095 Market Street, Suite 511
San Francisco, CA 94103
Telephone: (415) 436-9682

MOTION FOR SUMMARY
JUDGMENT

Facsimile: (415) 436-9683
bplater@biologicaldiversity.org

Justin Augustine (CA Bar  No. 235561)
*Pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
SAN FRANCISCO BAY AREA OFFICE
1095 Market Street, Suite 511
San Francisco, CA  94103
Telephone: (415) 436-9682
Facsimile: (415) 436-9683
jaugustine@biologicaldiversity.org

Attorneys for Plaintiff

- 2 -                    MOTION FOR SUMMARY
                              JUDGMENT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No.: 1:05-CV-01087 (JR) |
| CRAIG MANSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

Table of Contents ................................................................................................. i

Table of Authorities ............................................................................................ ii

I.      Introduction ........................................................................................... 1

II.     Background ............................................................................................ 3

   A.   Statutory and Regulatory Framework ................................................... 3

      1.   The Endangered Species Act ........................................................ 3

      2.   The Administrative Procedure Act ................................................ 6

   B.   Factual Background ............................................................................. 7

      1.   The Southwest Alaska Northern Sea Otter Distinct Population Segment ........... 7

      2.   History of the ESA Listing Process for the Southwest Alaskan Northern Sea
           Otter Distinct Population Segment ................................................ 10

III.    Argument ............................................................................................... 13

   A.   Standard of Review .............................................................................. 13

      1.   Standard of Review for Summary Judgment ................................. 13

      2.   Standard of Review for ESA Section 4 Violations ....................... 13

   B.   The Service Violated Its Mandatory Duty To Issue A Final Listing Decision.. 14

   C.   Plaintiff Is Entitled To An Injunction Ordering The Service To Comply Within
        30 Days Of This Court's Decision .................................................... 17

IV.     Conclusion ............................................................................................ 19

PLAINTIFF'S MEMORANDUM OF
            POINTS AND AUTHORITIES IN
            SUPPORT OF MOTION FOR
            SUMMARY JUDGMENT

## Table of Authorities

**Cases**

Am. Lands Alliance v. Norton

   242 F. Supp. 2d 1 (D.D.C. 2003) ...................................................................... 13, 15, 16

Anderson v. Liberty Lobby

   477 U.S. 242 (1986) ................................................................................................ 13

Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife Serv., 273 F.3d 1229 (9th

   Cir. 2001) ................................................................................................................ 14

Babitt v. Sweet Home Chapter of Communities for a Great Oregon

   515 U.S. 687 (1995) ................................................................................................. 3

Biodiversity Legal Found. v. Babbitt

   63 F. Supp. 2d 31 (D.D.C. 1999) ........................................................................... 15

Biodiversity Legal Found. v. Badgley

   309 F.3d 1166 (9th Cir. 2002) ................................................................................ 15

Cal. Native Plant Soc'y v. Norton

   2005 U.S. Dist. LEXIS 4634 (D.D.C. 2005) ........................................................ 10, 13

Center for Biological Diversity v. Evans

   No. 04 Civ. 04496 (N.D. Cal. June 14, 2005) ........................................................ 17

Center for Biological Diversity v. Norton

   240 F. Supp. 2d 1090 (D. Ariz. 2003) ................................................................... 18

Center for Biological Diversity v. Norton

   254 F.3d 833 (9th Cir. 2001) .................................................................................. 15

Defenders of Wildlife v. Babbitt

   958 F. Supp. 670 (D.D.C. 1997) ............................................................................ 13

PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

Environmental Defense Center v. Babbitt

    73 F.3d 867 (9th Cir. 1995) .................................................................. 16, 17

\*   Forest Guardians v. Babbitt

    174 F.3d 1178 (10th Cir. 1998) ............................................................ 15, 17

Gerber v. Norton

    294 F.3d 173 (D.C. Cir. 2002) ................................................................... 14

Gov't of the Province of Manitoba v. Norton

    2005 U.S. Dist. LEXIS 5142 (D.D.C. 2005) ............................................. 14

Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Cos.

    498 U.S. 211 (1991) .................................................................................... 14

Nebraska v. Wyoming

    507 U.S. 584 (1993) .................................................................................... 13

Envtl. Def. Ctr. v. Babbitt

    73 F.3d 867 (9th Cir. 1995) ....................................................................... 16

\*   Oregon Natural Resources Council v. Kantor

    99 F.3d 334 (9th Cir.1996) ........................................................................ 16

Save Our Springs v. Babbitt

27 F. Supp. 2d 739 (W.D. Tex. 1997) .......................................................... 17

Sierra Club v. Marsh

    816 F.2d 1376 (9th Cir. 1987) ................................................................... 18

Southwest Center for Biological Diversity v. Clark

    90 F. Supp. 2d 1300 (D. N.M. 1999) ........................................................ 18

Strahan v. Coxe

    127 F.3d 155 (1st Cir. 1997) ..................................................................... 18

- iii-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

\*    <u>Tennessee Valley Authority v. Hill</u>

   437 U.S. 153 (1978) .......................................................................................... 3, 18

\*    <u>United States v. Monsanto</u>

   491 U.S. 600 (1989) .......................................................................................... 15

\*    <u>United States v. Oakland Cannabis Buyers' Coop.</u>

   532 U.S. 483 (U.S. 2001) .................................................................................. 18

   <u>Weinberger v. Romero-Barcelo</u>

   456 U.S. 305 (U.S. 1982) .................................................................................. 18

**Statutes**

16 U.S.C. § 1531(a)(1) ........................................................................................... 3

16 U.S.C. § 1531(b) ............................................................................................... 3

16 U.S.C. § 1532(6) ............................................................................................... 3

16 U.S.C. § 1532(16) ............................................................................................. 4

16 U.S.C. § 1532(19) ............................................................................................. 5

16 U.S.C. § 1532(20) ............................................................................................. 3

16 U.S.C. § 1533(a)(1) ....................................................................................... 4, 19

16 U.S.C. § 1533(b)(3) ........................................................................................... 5

16 U.S.C. § 1533(b)(3)(A) ..................................................................................... 5

16 U.S.C. § 1533(b)(3)(B) ..................................................................................... 5

16 U.S.C. § 1533(b)(5) ........................................................................................... 5

16 U.S.C. § 1533(b)(6) ........................................................................... 6, 14, 16, 19

16 U.S.C. § 1533(b)(6)(A) ............................................................................. 6, 14, 19

16 U.S.C. § 1533(b)(6)(A)(i) ................................................................................. 6

16 U.S.C. § 1533(b)(6)(B)(i) ................................................................................. 6

- iv-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

16 U.S.C. § 1536(a)(2) ................................................................................ 4

16 U.S.C. § 1538(a)(1 ................................................................................. 4

16 U.S.C. § 1540(g) .............................................................................. 6, 13

16 U.S.C. § 1540(g)(1) .............................................................................. 6

5 U.S.C. § 706 ................................................................................... 7, 13

5 U.S.C. § 706(D) ................................................................................. 14

## Other Authorities

66 Fed. Reg. 54808 (Oct. 30, 2001) ........................................................ 11

67 Fed. Reg. 40657 (June 13, 2002) ....................................................... 11

69 Fed. Reg. 6600 (Feb.11, 2004). .............................................. 7, 8, 9, 10, 12

Doroff, A.M., J.A. Estes, M.T. Tinker, D.M. Burn, and T.J. Evans

    *Sea Otter Population Declines in the Aleutian Archipelago,* 84(1) Journal of

    Mammalogy 55 (2003) ........................................................................ 9

Estes, J.A., M.T. Tinker, A.M. Doroff, and D.M. Burn

    *Continuing Sea Otter Population Declines in the Aleutian Archipelago,* 21(1) Marine

    Mammal Science 169 (2005) ......................................................... 1, 10, 17

## Rules

Fed. R. Civ. P. 56(c) ............................................................................ 13

## Regulations

50 C.F.R. § 17.31 .................................................................................. 5

50 C.F.R. § 402.12(d) .............................................................................. 4

50 C.F.R. § 402.14(a) .............................................................................. 4

- v-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

## I.  Introduction

This suit addresses the plight of the southwest Alaska northern sea otter distinct population segment ("DPS").  Specifically, the United States Fish and Wildlife Service ("the Service") has missed, by almost six months now, the statutory deadline to finalize its February 11, 2004 proposed rule to list this DPS under the Endangered Species Act ("ESA").  The Service has been well aware of the massive decline of the sea otter and the resulting need to protect it under the ESA since at least October 25, 2000, when Plaintiff, Center for Biological Diversity ("the Center"), submitted a petition to list the DPS.  Instead of responding to this dire situation, however, the Service has abdicated its congressionally mandated legal duties.

Meanwhile, the sea otter population continues to collapse.  A recently published study conducted in the western part of the DPS's range states that "sea otter counts have continued to decline since 2000 at all islands surveyed … [at] an average rate … of 29% per year," an even greater decline rate than during the 1990's (17.9% per year).  Estes, J.A., M.T. Tinker, A.M. Doroff, and D.M. Burn, *Continuing Sea Otter Population Declines in the Aleutian Archipelago,* 21(1) Marine Mammal Science 169, 170 (2005) (See Exhibit A).  The authors of the study, two of whom are Service biologists, point out that their analysis "indicates overall population declines ranging from 92%-99% since 1965."  Id. at 171.  While such data is disheartening, it further demonstrates why the Service must be compelled by a court order to promptly fulfill its ESA obligations.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Section 4 of the ESA contains specific timelines for listing imperiled species. As the Service well knows, the substantive protections that the ESA affords to imperiled species do not apply unless the species first overcomes the hurdle of the listing process. Thus, it is not a mere technicality when the Service fails to adhere to the procedural timelines of the listing process. Rather, the ramifications are significant because the longer the Service delays the listing process, the longer a species fails to receive any ESA protection. Unfortunately, the Service continues to flout its ESA obligations, and consequently, species like the sea otter population at issue here drift closer to extinction.

Defendants were required to finalize the southwest Alaska northern sea otter DPS listing by February 11, 2005. Until that task is accomplished, the DPS will not receive the safeguards afforded by the ESA. Accordingly, in the interest of protecting the remaining southwest Alaska northern sea otters, Plaintiff moves for summary judgment to compel final listing for the species. Because no genuine factual disputes exist in this case (see Plaintiff's Statement of Material Facts as to Which Plaintiff Contends There Is No Genuine Issue), the Center is entitled to summary judgment that the Service has violated Section 4 of the ESA. Plaintiff respectfully requests the Court to issue declaratory relief and an injunction ordering the Service to issue a final rule for the southwest Alaska northern sea otter DPS[1] within 30 days.

---

[1]    Plaintiff has standing to bring this action. As stated in its complaint, the Center for Biological Diversity's staff and members have suffered and continue to suffer recreational, scientific, aesthetic, educational, or other injuries as a result of Defendant's violations of the ESA. See Plaintiff's Complaint for Declaratory and

- 2-    PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**II. Background**

    A. <u>Statutory and Regulatory Framework</u>

        1. <u>The Endangered Species Act</u>

The Endangered Species Act, passed by Congress in 1973 in response to increased concern over the extinction of fish, wildlife, and plants, 16 U.S.C. § 1531(a)(1), is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." <u>Babitt v. Sweet Home Chapter of Communities for a Great Oregon</u>, 515 U.S. 687, 698 (1995) (quoting <u>Tennessee Valley Authority v. Hill</u>, 437 U.S. 153, 180 (1978) ("<u>TVA</u>")). Congress established the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). In the words of the Supreme Court, the ESA reveals "an explicit congressional decision to afford first priority to the declared national policy of saving endangered species." <u>TVA</u>, 437 U.S. 153, 185.

The ESA defines "endangered" as a species the Service determines to be "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). "Threatened" refers to "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The term "species" is defined to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate

---

Injunctive Relief at ¶ 20; see also Declaration of Kieran Mulvaney (accompanying the instant motion).

                               - 3-     PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). Five factors

must be considered by the Service when determining whether a species is endangered or

threatened:

> 1. the present or threatened destruction, modification, or curtailment of [the
> species'] habitat or range;
> 2. over-utilization for commercial, recreational, scientific, or educational
> purposes;
> 3. disease or predation;
> 4. the inadequacy of existing regulatory mechanisms; and
> 5. other natural or manmade factors affecting [the species'] continued existence.

16 U.S.C. § 1533(a)(1).

The ESA's protective measures only apply to those species, subspecies, or

distinct population segments formally listed pursuant to Section 4 of the statute. See 50

C.F.R. § 402.12(d). The ESA's protective measures include Section 7 of the Act, which

requires all federal agencies to ensure that actions authorized, funded, or carried out by

such agencies are "not likely to jeopardize the continued existence of any endangered

species or threatened species or result in the destruction or adverse modification of

[critical habitat] of such species." 16 U.S.C. § 1536(a)(2). Under Section 7, an agency

must formally consult with the Service if the agency takes action that "may affect" a

listed species or its critical habitat. 50 C.F.R. § 402.14(a). Listing also affords the

protection of Section 9 of the ESA and its implementing regulations which prohibit the

"take" of a threatened or endangered species. 16 U.S.C. § 1538(a)(1), 50 C.F.R. §

- 4-     PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

17.31[2].  Take is defined to include "harming, harassing, trapping, capturing, wounding, or killing a protected species."  16 U.S.C. § 1532(19).

Citizens can initiate the listing process by sending a petition to the Service. 16 U.S.C. § 1533(b)(3).  Once that petition is received, the Service has 90 days to decide whether the petition contains "substantial, scientific, or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A).  If the Secretary finds that the petition presents substantial information such that a listing may be warranted, then he or she publishes in the Federal Register a "90 day finding and commencement of status review."  Id.

If the petition presents substantial information, twelve months after the receipt of the petition, the Service must make one of three determinations: 1. listing is not warranted, 2. listing is warranted, or 3. listing is warranted but precluded by other pending proposals.  16 U.S.C. § 1533(b)(3)(B).  If the Service determines that listing a species is warranted, it must then publish a proposed rule to list the species in the Federal Register.  16 U.S.C. § 1533(b)(5).

Publication of the proposed rule triggers the deadline for a final listing determination.  Within one year of the publication of the proposed rule, the Service must conclude its final determination and publish it in the Federal Register.  16 U.S.C. §

---

[2]      While the take provisions of Section 9 do not automatically apply to threatened species, pursuant to statutory authority under 16 U.S.C. § 1533(d), the Secretary has extended the take prohibitions to threatened species unless special rules specifying prohibitions are promulgated.  See 50 C.F.R. § 17.31.

- 5-      PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1533(b)(6)(A).  Three options are available to the Service when making the final

determination:

> 1. a final regulation to implement [the proposed rule],
> 2. notice that the proposed regulation is being withdrawn…together with the finding on which such withdrawal is based, or
> 3. notice that such one-year period is being extended [for not more than six months]…[because] there is substantial disagreement regarding the sufficiency or accuracy of the available data.

16 U.S.C. § 1533(b)(6)(A)(i), 1533(b)(6)(B)(i).

Section 1540(g) of the ESA authorizes any person to sue if the Service fails to

adhere to Section 4's mandatory duties and deadlines.  This provision of the ESA

specifically provides courts with jurisdiction over actions "to enjoin any person,

including the United States and any other governmental instrumentality or agency…"

and actions that allege "a failure of the Secretary to perform any act or duty under

section 1533 which is not discretionary with the Secretary."  16 U.S.C. § 1540(g)(1).

Thus, all mandatory duties and deadlines described in Section 4 of the ESA are

enforceable through the ESA's citizen suit provision.

## 2.   The Administrative Procedure Act

Because the ESA lacks its own standard of review, the Administrative Procedure

applies to this case.  Section 706 of the APA specifically states that courts shall

> 1. compel agency action unlawfully withheld or unreasonably delayed; and
> 2. hold unlawful and set aside agency action, findings, and conclusions found to be
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> (B) contrary to constitutional right, power, privilege, or immunity;

- 6-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

(C) in excess of statutory jurisdiction, authority, or limitations, or
short of statutory right;
(D) without observance of procedure required by law…

5 U.S.C. § 706.

    B.  <u>Factual Background</u><u>3</u>

        1.  <u>The Southwest Alaska Northern Sea Otter Distinct Population
Segment</u>

The overall sea otter population is divided into three subspecies--*Enhydra lutris
kenyoni*, *E. lutris lutris*, and *E. lutris nereis*.  See <u>Plaintiff's Sep. Statement</u>, ¶ 3; 69 Fed.
Reg. 6600, 6601 (Feb.11, 2004).  *E. lutris kenyoni* and *E. lutris lutris* are both commonly
referred to as the "northern sea otter."  See <u>Plaintiff's Sep. Statement</u>, ¶ 4; 69 Fed. Reg. at
6601.  *E. lutris kenyoni* is distributed from the Aleutian Islands in Alaska, across the
Pacific Coast of Alaska and British Columbia, to the coastal areas of Washington.  <u>Id.</u>  *E.
lutris lutris* is found in the Kuril Islands, the Kamchatka Peninsula, and the Commander
Islands in Russia.  <u>Id.</u>  *E. lutris nereis*, commonly referred to as the "southern sea otter,"
lives in coastal waters along California.  <u>Id.</u>

As the Service recognizes, the subspecies *E. lutris kenyoni* is further comprised of
three distinct population segments.  See <u>Plaintiff's Sep. Statement</u>, ¶ 5; 69 Fed. Reg. at
6604.  One such distinct population, referred to as the "southwest Alaska northern sea
otter DPS," is at issue in this case.  <u>Id.</u>  It ranges from Attu Island in the Aleutians

---

3      The following facts are set forth in more detail, with supporting citations, in the
accompanying Plaintiff's Statement of Material Facts as to Which There Is No Genuine
Issue.

- 7-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

through the western shores of Cook Inlet, including the Alaska Peninsula and the Kodiak Archipelago in Alaska.  Id.

The smallest of all marine mammals, sea otters are most often found on the ocean surface, swimming belly up, forepaws on their chests, while paddling with their hind feet. See Plaintiff's Sep. Statement, ¶ 1; 69 Fed. Reg. at 6602.  Described as a "keystone" species, sea otters strongly influence the composition and diversity of their environment. See Plaintiff's Sep. Statement, ¶ 2; 69 Fed. Reg. at 6602.  Studies of subtidal communities in Alaska have demonstrated that, when sea otters are abundant, sea urchins will be present at low densities whereas kelp, which is consumed by sea urchins, will flourish. Id.  Conversely, when sea otters are absent, abundant sea urchin populations create areas of low kelp abundance, known as urchin barrens because when kelp beds are lost many species are unable to survive.  Id.

Prior to their exploitation by commercial hunters, which began with the 1741 Bering/Chirikof expedition to Alaska, the overall sea otter population was estimated at 150,000 to 300,000 individuals.  See Plaintiff's Sep. Statement, ¶ 6; 69 Fed. Reg. at 6604. Due to the extensive hunting, the species reached critically low numbers—at one point the entire population may have been reduced to only 1,000-2,000 animals.  Id. Fortunately, in 1911, international protection put an end to the commercial hunting.  Id. However, by that time, only 13 isolated populations were known to still exist, two of which eventually became extinct.  Id.

Once commercial harvests ceased, 11 of the 13 remaining sea otter populations (six of which constitute the southwest Alaska northern sea otter DPS) gradually

- 8-     PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

rebounded.  See <u>Plaintiff's Sep. Statement</u>, ¶ 7; 69 Fed. Reg. at 6610.  In the 1980's,

survey data indicated that the population had increased such that the southwest Alaska

northern sea otter DPS contained an estimated 94,000-128,000 individuals, 80% of the

known world sea otter population at that time.  <u>Id.</u>

Since the mid-1980's, however, the southwest Alaska northern sea otter DPS has

"undergone a precipitous population decline of at least 56-68 percent."  See <u>Plaintiff's</u>

<u>Sep. Statement</u>, ¶ 8; 69 Fed. Reg. at 6600.  While "the ultimate cause remains unknown,"

the Service hypothesizes that the decline "may be the result of changes in the ecosystem."

See <u>Plaintiff's Sep. Statement</u>, ¶ 10; 69 Fed. Reg. at 6617.  As pointed out in the journal

article, *Sea Otter Population Declines in the Aleutian Archipelago,* the sea otter declines

are notable "because they occurred immediately after abrupt population declines in 3

broadly sympatric species of pinniped (northern fur seals, Stellar sea lion, and harbor

seals)."  See <u>Plaintiff's Sep. Statement</u>, ¶ 10; Doroff, A.M., J.A. Estes, M.T. Tinker, D.M.

Burn, and T.J. Evans, *Sea Otter Population Declines in the Aleutian Archipelago,* 84(1)

Journal of Mammalogy 55, 63 (2003) (See Exhibit B).  Currently, the Service has "no

evidence to indicate that the decline has abated, and…no reason to expect that the decline

will cease."  See <u>Plaintiff's Sep. Statement</u>, ¶ 11; 69 Fed. Reg. at 6617.

Moreover, a study published subsequent to publication of the proposed rule

indicates that the sea otter decline is severe and on-going.  In the peer-reviewed scientific

journal Marine Mammal Science,  several scientists, including the Service's own experts

in sea otter biology and abundance, published a study stating that "sea otter counts have

continued to decline since 2000 at all islands surveyed…[at] an average rate of

- 9 -    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

population decline of 29% per year [between 2000 and 2003]." See Plaintiff's Sep.

Statement, ¶ 9; Estes, J.A., M.T. Tinker, A.M. Doroff, and D.M. Burn, *Continuing Sea*

*Otter Population Declines in the Aleutian Archipelago*, 21(1) Marine Mammal Science

169, 170 (2005).  The article pointed out that in the study area, "overall population

declines range from 92% to 99% since 1965," and currently "the Aleutian Island sea otter

population is approximately 3% of the estimated carrying capacity for the Islands."  Id.

As the Service itself concludes in the proposed rule notice, "the severity and widespread

nature of the decline in the southwest Alaska sea otter DPS is quite serious."  See

Plaintiff's Sep. Statement, ¶ 24; 69 Fed. Reg. at 6617-18.

> 2.  History of the ESA Listing Process for the Southwest Alaskan
>     Northern Sea Otter Distinct Population Segment

Due to the dramatic decline and loss of northern sea otters, the Center submitted a

formal petition on October 25, 2000, requesting that the Service list the southwest Alaska

northern sea otter population as endangered.  See Plaintiff's Sep. Statement, ¶ 12; 69 Fed.

Reg. at 6611.  However, rather than providing ESA protection to the sea otters, the

Service published in the Federal Register a notice that the DPS had been designated as a

candidate species under the Endangered Species Act.  See Plaintiff's Sep. Statement, ¶

13; 65 Fed. Reg. 67343 (Nov. 9, 2000).  Candidate species receive no substantive

protection under the ESA.  Plaintiff's Sep. Statement, ¶ 14; Cal. Native Plant Soc'y v.

Norton, 2005 U.S. Dist. LEXIS 4634, *1 (D.D.C. 2005).  See also, 50 C.F.R. 402.12(d)

("Candidate species have no legal status and are accorded no protection under the Act.")

PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

In response to the Service's actions, on November 15, 2000, the Center filed a 60-day notice of intent to sue the Service for violations of the Endangered Species Act. See Plaintiff's Sep. Statement, ¶ 15. The letter alleged that deeming the listing of the sea otter population to be "warranted but precluded" via candidate classification violated the ESA because the Service could not claim that there were any species of higher listing priority within the Alaska Region. Id.

On October 30, 2001, the Service published a Candidate Notice of Review (hereinafter "2001 CNOR"). See Plaintiff's Sep. Statement, ¶ 16; 66 Fed. Reg. 54808 (Oct. 30, 2001). In the 2001 CNOR, the Service stated that "immediate action is needed" to list the southwest Alaska DPS of northern sea otter because there was "no indication that the decline has reached an endpoint." Id. Nonetheless, the Service determined that publication of a proposed rule to list the species was precluded by higher-priority listing actions. Id.

On June 13, 2002, the Service published another Candidate Notice of Review (hereinafter "2002 CNOR") that again reached a "warranted but precluded" finding for the southwest Alaska northern sea otter DPS. See Plaintiff's Sep. Statement, ¶ 17; 67 Fed. Reg. 40657 (June 13, 2002). In the 2002 CNOR, the Service restated that "immediate action is needed" to list the population. Id. However, unlike the 2001 CNOR, the Service also stated that it must "work in the next year on proposed rules for . . . the southwest Alaska population of the northern sea otter." Id.

On December 4, 2003, the Center filed a complaint for injunctive and declaratory relief in United States District Court, Northern District of California, against the Service.

- 11-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

See <u>Plaintiff's Sep. Statement</u>, ¶ 18.  Requested relief included a permanent injunction for the Service to issue a 12-month finding on the Center's petition to list the southwest Alaska northern sea otter DPS as endangered.  <u>Id.</u>

On February 11, 2004, almost four years after the Center filed its listing petition, the Service officially published in the Federal Register a proposed rule to list the southwest Alaska northern sea otter DPS as threatened under the ESA.  See <u>Plaintiff's Sep. Statement,</u> ¶ 19; 69 Fed. Reg. 6600.

The proposed rule acknowledged that the precipitous decline in the northern sea otter population may continue unless protective provisions are put in place, and specifically pointed out that listing a species to be protected by the ESA results in "public awareness and conservation actions by Federal, State, and local agencies, private organizations, and individuals."  See <u>Plaintiff's Sep. Statement</u>, ¶ 20, 21.

Although the Service stated in its proposed rule that the decline of this DPS is "quite serious," and that listing a species to be protected under the Endangered Species Act will result in conservation actions, the Service continues to withhold its final determination on the proposed rule.  See <u>Plaintiff's Sep. Statement</u>, ¶ 24.  To date, no final rule has been published in the Federal Register for the southwest Alaska northern sea otter DPS.  <u>Id.</u>

PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

**III. Argument**

    A. <u>Standard of Review</u>

        1. <u>Standard of Review for Summary Judgment</u>

Federal Rule of Civil Procedure 56 permits summary judgment when "there is no genuine issue as to any material fact…and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also <u>Nebraska v. Wyoming</u>, 507 U.S. 584, 590 (1993). The Supreme Court has stated that the proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 251-52 (1986).

In regard to ESA violations by the Service, the courts of the D.C. Circuit recognize that summary judgment is appropriate. See <u>Cal. Native Plant Soc'y v. Norton</u>, 2005 U.S. Dist. LEXIS 4634 (D.D.C. 2005); <u>Am. Lands Alliance v. Norton</u>, 242 F. Supp. 2d 1 (D.D.C. 2003); <u>Defenders of Wildlife v. Babbitt</u>, 958 F. Supp. 670 (D.D.C. 1997).

        2. <u>Standard of Review for ESA Section 4 Violations</u>

This case is brought pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and pursuant to the APA, 5 U.S.C. § 706. Because the ESA does not contain its own internal standard of review, this Court must address whether the Service's failure to issue a final rule for the southwest Alaska northern sea otter DPS violates section 706 of the APA because it is "agency action unlawfully withheld or unreasonably delayed; arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in

- 13-    PLAINTIFF'S MEMORANDUM OF
                  POINTS AND AUTHORITIES IN
                  SUPPORT OF MOTION FOR
                  SUMMARY JUDGMENT

excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law…."  5 U.S.C. § 706(D); See <u>Gerber v. Norton</u>, 294 F.3d 173, 178 (D.C. Cir. 2002).  As recently pointed out by a district court in this Circuit, "a court must thoroughly review an agency's decision and may not 'rubber stamp' decisions that are inconsistent with statutory mandate or congressional policy." <u>Gov't of the Province of Manitoba v. Norton</u>, 2005 U.S. Dist. LEXIS 5142, *31 (D.D.C. 2005) (citing <u>Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife Serv.</u>, 273 F.3d 1229, 1236 (9th Cir. 2001).

    B.  <u>The Service Violated Its Mandatory Duty To Issue A Final Listing Decision</u>

    The ESA's listing timelines are "clear and unambiguous." See <u>Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Cos.</u>, 498 U.S. 211, 223 (1991)("if the statute is clear and unambiguous, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").  Section 4 of the ESA specifically mandates that "within the one year period" following the publication of the proposed rule, the Service "shall publish either a final regulation to implement such determination; notice that such one-year period is being extended under subparagraph (B)(i), or notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based."  16 U.S.C. § 1533(b)(6)(A).  The Service has not undertaken any of these actions--since the proposed rule was published on February 11, 2004, the

- 14-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

Service has failed to make any final determination for the sea otter, and therefore, is in clear violation of the ESA.

As the Supreme Court has pointed out, the use of the word "shall" by Congress demonstrates a desire for mandatory action.  United States v. Monsanto, 491 U.S. 600, 607 (1989) ("[by using 'shall'] Congress could not have chosen stronger words to express its intent that forfeiture be mandatory"); see also Am. Lands Alliance v. Norton, 242 F. Supp. 2d 1, 10 (D.D.C. 2003), (quoting Forest Guardians v. Babbitt, 174 F.3d 1178, 1187 (10th Cir. 1998) ("The Supreme Court has made clear 'that when a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command.'").  Therefore, when Congress chose to use explicit "shall" language in Section 4 of the ESA, its intent was unequivocal.  Section 4's language demonstrates Congress' unambiguous desire that the listing process be unhindered by bureaucratic delay.  See Biodiversity Legal Found. v. Badgley, 309 F.3d 1166, 1175 (9th Cir. 2002) ("timeliness in the listing process is essential.") (quoting Center for Biological Diversity v. Norton, 254 F.3d 833, 839 (9th Cir. 2001)).

Courts in the D.C. Circuit have already addressed the mandatory nature of ESA timelines.  In Biodiversity Legal Found. v. Babbitt, the court considered "whether the 12-month deadline for issuance of final decisions on citizen petitions is as flexible as the 90-day deadline for preliminary findings."  63 F. Supp. 2d 31, 34 (D.D.C. 1999).  The court specifically answered in the negative stating that "[t]he language is clumsy, but not ambiguous....The 12 month period runs from the receipt of the petition, not from the preliminary finding."  Id.  More recently, in Am. Lands Alliance v. Norton, a D.C. court

- 15-    PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

declared that "the Secretary's duty to make a 12-month finding when a public petition

has been filed is a 'mandatory, nondiscretionary duty.'"  242 F. Supp. 2d 1, 10 (D.D.C.

2003) (quoting Envtl. Def. Ctr. v. Babbitt, 73 F.3d 867, 871 (9th Cir. 1995)).

      The ESA is likewise "not ambiguous" about the timeline for final rule

publication.  In fact, the Ninth Circuit has already reached such a conclusion.  In Oregon

Natural Resources Council v. Kantor, the Ninth Circuit addressed this exact issue—

namely, "when is [the Service] required to act on the possible publication of a final

regulation?"  99 F.3d 334, 338-39 (9th Cir.1996).  Stating that the "language of the ESA

regarding the deadlines for action could hardly be more clear," the Ninth Circuit

answered, unsurprisingly, that the Service must act within "one year from the publication

of the proposed regulation."  Id.

      Nonetheless, despite court admonishments and despite the straightforward

wording of the ESA listing process, the Service continues to ignore its ESA obligations.

The Service published the sea otter proposed rule on February 11, 2004.  The ESA

specifically states that the final determination must be published in the Federal Register

within the one year period following the proposed rule publication.  16 U.S.C. §

1533(b)(6).  Because it is undisputed that the Service failed to issue a final determination

for the sea otter by the February 11, 2005, deadline and continues to withhold a final

determination, Plaintiff Center for Biological Diversity is entitled to summary judgment.

PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

C.  Plaintiff Is Entitled To An Injunction Ordering The Service To Comply
Within 30 Days Of This Court's Decision

As already pointed out, recent studies show that the decline of the southwest

Alaska northern sea otter DPS continues unabated.  See Estes, J.A., M.T. Tinker, A.M.

Doroff, and D.M. Burn, *Continuing Sea Otter Population Declines in the Aleutian*

*Archipelago*, 21(1) Marine Mammal Science 169, 170 (2005).  The Service, however, in

spite of the urgent need for action, refuses to fulfill its statutory obligation.  Already,

over 150 days have passed since the Service was required to publish its final notice in

the Federal Register.  Thus, any argument on the part of the Service that causes further

delay should be rejected.  Instead, this Court should order the Service to issue the final

listing for the southwest Alaska northern sea otter DPS within 30 days.  See Forest

Guardians v. Babbitt, 174 F.3d 1178, 1193 (10th Cir. 1998)

> ("For guidance [regarding injunctive relief], we refer the district
> court to the proceedings in Environmental Defense Center v.
> Babbitt, 73 F.3d 867 (9th Cir. 1995).  [T]he Ninth Circuit held
> that the Secretary violated his nondiscretionary duties to take
> final action on the California red-legged frog, but remanded to
> the district court to specify the time for compliance with the ESA
> ….  [T]he district court ordered the Secretary to list the red-
> legged frog within 14 days.");

Save Our Springs v. Babbitt, 27 F. Supp. 2d 739, 749 (W.D. Tex. 1997) (The court

ordered the Defendants to act within 30 days on final listing of the Barton Springs

salamander.); Center for Biological Diversity v. Evans, No. 04 Civ. 04496 (N.D. Cal.

June 14, 2005) (The court ordered the National Marine Fisheries Service to issue a

proposed rule for critical habitat within 4 ½ months) (See Exhibit C); Center for

Biological Diversity v. Norton, 240 F. Supp. 2d 1090, 1108 (D. Ariz. 2003) (D. Ariz.

- 17-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

2003) (The Service was ordered to issue a draft critical habitat designation for the cactus ferruginous pygmy owl within three months of the court's order.); <u>Southwest Center for Biological Diversity v. Clark</u>, 90 F. Supp. 2d 1300, 1313 (D. N.M. 1999) (The court ordered the Defendants to issue final critical habitat designations for the fish species within five months of its order.).

In <u>United States v. Oakland Cannabis Buyers' Coop.</u>, the Supreme Court highlighted the fact that a court's equitable discretion can be superseded "by a clear and valid legislative command."   532 U.S. 483, 496 (U.S. 2001).  In this suit, the ESA provides such a command: "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution."  <u>TVA</u>, 437 U.S. 153, 194 (U.S., 1978); see also <u>United States v. Oakland Cannabis Buyers' Coop.</u>, 532 U.S. at 496-97 (describing the ESA as an example of where Congress legislated a clear command).  Just in case that pronouncement was not transparent enough, the Court, in <u>Weinberger v. Romero-Barcelo</u>, re-emphasized its position:  "In <u>TVA</u>, we held that Congress had foreclosed the exercise of the usual discretion possessed by a court of equity….The purpose and language of the statute limited the remedies available to the District Court; *only an injunction could vindicate the objectives of the Act*."  456 U.S. 305, 313-314 (U.S. 1982) (emphasis added); see also <u>Strahan v. Coxe</u>, 127 F.3d 155, 160 (1st Cir. 1997) ("Under the ESA, the balance of hardships…tips heavily in favor of protected species."); <u>Sierra Club v. Marsh</u>, 816 F.2d 1376, 1383-84 (9th Cir. 1987) (with respect to violations of the

- 18-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

ESA, "the Supreme Court held that Congress had explicitly foreclosed the exercise of

traditional equitable discretion by courts.").  Therefore, this Court should follow the

guidance of the Supreme Court and order the Service to immediately act in accordance

with the ESA and publish the final rule determination for the southwest Alaska northern

sea otter DPS.  Only then will the sea otter potentially receive the ESA protections it

warrants as a threatened species.

## IV. Conclusion

For the reasons provided above, this Court should declare that the Service is in

violation of the ESA for failing to issue a final decision on the proposed rule to list the

southwest Alaska northern sea otter DPS, as required by 16 U.S.C. § 1533(a)(1) and 16

U.S.C. § 1533(b)(6)(A).  In addition, this Court should order the Service to issue its final

rule determination regarding the southwest Alaska northern sea otter DPS within 30 days

of the Court's decision.


Dated: August 5, 2005

Respectfully submitted,


Brent Plater (DC Bar No. 486505)
CENTER FOR BIOLOGICAL DIVERSITY
SAN FRANCISCO BAY AREA OFFICE
1095 Market Street, Suite 511
San Francisco, CA 94103
Telephone:  (415) 436-9682


- 19-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

Facsimile: (415) 436-9683
bplater@biologicaldiversity.org

Justin Augustine (CA Bar  No. 235561)
*Pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
SAN FRANCISCO BAY AREA OFFICE
1095 Market Street, Suite 511
San Francisco, CA  94103
Telephone: (415) 436-9682
Facsimile: (415) 436-9683
jaugustine@biologicaldiversity.org

Attorneys for Plaintiff

- 20-    PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No.: 1:05-CV-01087 (JR) |
| CRAIG MANSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE
IS NO GENUINE ISSUE**

Pursuant to Local Rule 7(h), Plaintiff Center for Biological Diversity respectfully
submits this Statement of Material Facts As to Which There Is No Genuine Issue in
support of its Motion for Summary Judgment:

**The Southwest Alaska Northern Sea Otter Distinct Population Segment**

1.      Sea otters are the smallest of all marine mammals.  They have a long,
heavy body, making terrestrial travel clumsy and slow.  Seldom seen on shore, sea otters
are usually found on the ocean surface, swimming belly up, with forepaws on their chests
while paddling with their hind feet.  Underwater, sea otters propel themselves through the
ocean using an undulating swimming motion, not unlike other marine mammals.  Sea
otters sleep in kelp beds or in calm water while floating on their backs.  Lacking the
blubber layer found in most marine mammals, sea otters depend entirely upon their fur,
the densest mammalian fur in the world, for insulation.  As carnivores, sea otters
primarily eat a wide variety of benthic (living in or on the sea floor) invertebrates,
including sea urchins, clams, mussels, crabs, and octopus.  Endangered and Threatened
Wildlife and Plants; Listing the Southwest Alaska Distinct Population Segment of the

Northern Sea Otter (Enhydra lutris kenyoni) as Threatened, 69 Fed. Reg. 6600, 6602 (Feb.11, 2004).

2.    Described as a "keystone" species, northern sea otters strongly influence the composition and diversity of their environment.  Studies of subtidal communities in Alaska have demonstrated that, when sea otters are abundant, species such as sea urchins will be present at low densities whereas kelp, which is consumed by sea urchins, will flourish. Conversely, when sea otters are absent, abundant sea urchin populations create areas of low kelp abundance, known as "urchin barrens" because when kelp beds are lost many species are unable to survive.  Id.

3.    Scientists have confirmed that three sea otter subspecies exist.  The United States Fish and Wildlife Service ("the Service") has accepted and adopted these findings for purposes of the Endangered Species Act.  The three subspecies are *Enhydra lutris kenyoni*, *E. lutris lutris*, and *E. lutris nereis*.  Id. at 6601.

4.    *E. lutris kenyoni* and *E. lutris lutris* are both commonly referred to as the "northern sea otter."  *E. lutris kenyoni* is distributed from the Aleutian Islands in Alaska, across the Pacific Coast of Alaska and British Columbia, to the coastal areas of Washington.  *E. lutris lutris* is found in the Kuril Islands, the Kamchatka Peninsula, and the Commander Islands in Russia.  *E. lutris nereis* is commonly referred to as the "southern sea otter," and lives in coastal waters along California.  Id.

5.    The Service has determined that the subspecies *E. lutris kenyoni* is comprised of three distinct population segments.  One distinct population, referred to as the "southwest Alaska northern sea otter DPS," ranges from Attu Island in the Aleutians through the western shores of Cook Inlet, including the Alaska Peninsula and the Kodiak

Archipelago in Alaska. The southwest Alaska northern sea otter DPS is the only sea otter population at issue in this case. Id. at 6604.

6.    Extensive commercial hunting of sea otters, which began with the 1741 Bering/Chirikof expedition to Alaska, decimated the species. Prior to this, the sea otter population was estimated at 150,000 to 300,000 individuals. By the time sea otters were afforded international protection in 1911, the species was nearly extinct throughout its range, with only 1,000 to 2,000 individual animals remaining alive. These remaining otters were scattered throughout the species' former range in 13 isolated populations, two of which eventually went extinct. Id. at 6604.

7.    Once commercial harvests ceased, sea otter populations slowly increased and the otters recolonized their former range. In the Aleutian Islands, survey data indicate that otters were present in all island groups by the 1980s, and the population had increased such that the southwest Alaska northern sea otter DPS contained an estimated 94,000 to 128,000 individuals, 80% of the known world sea otter population. Id. at 6610.

8.    Since the mid-1980s, however, the southwest Alaska northern sea otter DPS has undergone a precipitous population decline of at least 56 to 68 percent. Id. at 6600. Between 1985 and 2000, the population crashed from a peak of over 128,000 individuals to about 40,000. Id. at 6610.

9.    An article published subsequent to publication of the proposed rule indicates that the sea otter decline is severe and on-going. In the peer-reviewed scientific journal Marine Mammal Science, several scientists, including the Service's own experts in sea otter biology and abundance, published a study stating that "sea otter counts have continued to decline since 2000 at all islands surveyed…[at] an average rate of

population decline of 29% per year [between 2000 and 2003]." The article points out that

in the study area, "overall population declines range from 92% to 99% since 1965," and

currently "the Aleutian Island sea otter population is approximately 3% of the estimated

carrying capacity for the Islands." Estes, J.A., M.T. Tinker, A.M. Doroff, and D.M.

Burn, *Continuing Sea Otter Population Declines in the Aleutian Archipelago*, 21(1)

Marine Mammal Science 169, 170-71 (2005) (See Exhibit A).

       10.     The Service hypothesizes that the DPS's decline may be the result of

significant changes in the Bering Sea ecosystem. 69 Fed. Reg. at 6617. As pointed out

in the journal article, *Sea Otter Population Declines in the Aleutian Archipelago,* the sea

otter declines are notable "because they occurred immediately after abrupt population

declines in 3 broadly sympatric species of pinniped (northern fur seals, Stellar sea lion,

and harbor seals)." Doroff, A.M., J.A. Estes, M.T. Tinker, D.M. Burn, and T.J. Evans,

*Sea Otter Population Declines in the Aleutian Archipelago,* 84(1) Journal of Mammalogy

55, 63 (2003) (See Exhibit B).

       11.     However, the Service stated "the ultimate cause remains unknown," and

"regardless of the cause, the severity and widespread nature of the decline in the

southwest Alaska sea otter DPS is quite serious." Currently, the Service has "no

evidence to indicate that the decline has abated, and…no reason to expect that the decline

will cease. If the trend were to continue …the DPS would be further reduced from its

current level by 66-89 percent in 20 years, and could become extirpated in portions of its

range." Id. at 6617.

**History of the ESA Listing Process for the Southwest Alaska Northern Sea Otter DPS**

12.     In response to the massive decline of the southwest Alaska northern sea otter DPS, the Center for Biological Diversity ("the Center") filed a petition to list the population as "endangered" under the Endangered Species Act with the Service on October 26, 2000.  69 Fed. Reg. at 6611.

13.     The Service subsequently published in the Federal Register a notice that the southwest Alaska northern sea otter DPS had been designated as a candidate species under the Endangered Species Act.  Endangered and Threatened Wildlife and Plants; Notice of Designation of the Northern Sea Otter in the Aleutian Islands as a Candidate Species, 65 Fed. Reg. 67343 (Nov. 9, 2000).

14.     Candidate species receive no substantive protection under the ESA.  Cal. Native Plant Soc'y v. Norton, 2005 U.S. Dist. LEXIS 4634, *1 (D.D.C. 2005).  See also, 50 C.F.R. 402.12(d) ("Candidate species have no legal status and are accorded no protection under the Act.").

15.     On November 15, 2000, the Center filed a 60-day notice of intent to sue the Service for violations of the Endangered Species Act in response to the Service's November 9, 2000 candidate notice for the southwest Alaska northern sea otter DPS. The Center alleged that deeming the listing of this population to be "warranted but precluded" via candidate classification violated the ESA because the Service could not claim that there were any species of higher listing priority within the Alaska Region.

16.     On October 30, 2001, the Service published a Candidate Notice of Review ("2001 CNOR").  Endangered and Threatened Wildlife and Plants; Review of Plant and Animal Species That Are Candidates or Proposed for Listing as Endangered or

- 5 -    STATEMENT OF MATERIAL FACTS

<u>Threatened, Annual Notice of Findings on Recycled Petitions, and Annual Description of</u>
<u>Progress on Listing Actions; Proposed Rule</u>, 66 Fed. Reg. 54808 (Oct. 30, 2001).  In the
2001 CNOR, the Service stated that "immediate action is needed" to list the southwest
Alaska DPS of northern sea otter because there was "no indication that the decline has
reached an endpoint."  <u>Id.</u> at 54816.  Nonetheless, the Service determined that publication
of a proposed rule to list the species was precluded by higher-priority listing actions.  <u>Id.</u>

17.    On June 13, 2002, the Service published another Candidate Notice of
Review ("2002 CNOR") that repeated a "warranted but precluded" finding for the
southwest Alaska northern sea otter DPS.  <u>Endangered and Threatened Wildlife and</u>
<u>Plants; Review of Species That Are Candidates or Proposed for Listing as Endangered or</u>
<u>Threatened; Annual Notice of Findings on Recycled Petitions; Annual Description of</u>
<u>Progress on Listing Actions</u>, 67 Fed. Reg. 40657 (June 13, 2002).  In the 2002 CNOR,
the Service restated that "immediate action is needed" to list the population.  Id. at 40666.
However, unlike the 2001 CNOR, the Service also stated that it would "work in the next
year on proposed rules for . . . the southwest Alaska population of the northern sea otter"
<u>Id.</u> at 40665.

18.    On December 4, 2003, the Center filed a complaint for injunctive and
declaratory relief in United States District Court, Northern District of California, against
the Service.  Requested relief included a permanent injunction for the Service to issue a
12-month finding on the Center's petition to list the southwest Alaska northern sea otter
DPS as endangered.

19.    On February 11, 2004—almost four years after the Center filed its listing
petition and mere weeks after the Center filed a lawsuit against the Service for failing to

respond to the Center's petition—the Service officially published in the Federal Register a proposed rule to list the southwest Alaska northern sea otter DPS under the Endangered Species Act.  69 Fed. Reg. 6600.

20.    The proposed rule explicitly acknowledged that the precipitous decline in the northern sea otter population may continue unless protective provisions are put in place.  Id. at 6617.

21.    The proposed rule pointed out that listing a species to be protected by the Endangered Species Act results in "public awareness and conservation actions by Federal, State, and local agencies, private organizations, and individuals." Id. at 6618.

22.    Under the ESA, a final rule determination "shall" be published in the Federal Register "within the one-year period beginning on the date on which general notice is published…regarding a proposed regulation."  16 U.S.C. § 1533(6)(A).

23.     Because the proposed rule for the sea otter was published in the Federal Register on February 11, 2004, a final determination was due in the Federal Register by February 11, 2005.

24.    Although the Service admitted in the proposed rule that the decline of this DPS is "quite serious," and that listing a species to be protected by the Endangered Species Act will result in conservation actions by government agencies, the Service continues to withhold its final determination.  Id. at 6617-18.  To date, no final rule has been published in the Federal Register for the southwest Alaska northern sea otter DPS.

Dated:  August 5, 2005

Respectfully submitted,

_____

Brent Plater (DC Bar No. 486505)
CENTER FOR BIOLOGICAL DIVERSITY
SAN FRANCISCO BAY AREA OFFICE
1095 Market Street, Suite 511
San Francisco, CA 94103
Telephone:  (415) 436-9682
Facsimile: (415) 436-9683
bplater@biologicaldiversity.org

Justin Augustine (CA Bar  No. 235561)
*Pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
SAN FRANCISCO BAY AREA OFFICE
1095 Market Street, Suite 511
San Francisco, CA  94103
Telephone: (415) 436-9682
Facsimile: (415) 436-9683
jaugustine@biologicaldiversity.org

Attorneys for Plaintiff