IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation, DOUGLAS L. LEVINGTON, an individual, DIANE LADOUCEUR, an individual, and KIERAN MULVANEY, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>DON EVANS, Secretary of Commerce. U. S. Department of Commerce, and WILLIAM T. HOGARTH, Assistant Administrator for Fisheries, National Marine Fisheries Service,<br><br>Defendants. | No. C 04-04496 WHA<br><br>**ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS AND AGAINST DEFENDANTS** |

**INTRODUCTION**

One of the most endangered mammals is the right whale. It was among the first group of species to be listed as endangered in 1971. After 34 years, the agency responsible has yet failed to designate any critical habitat in the Pacific Ocean. This order directs the agency to make the required statutory decision by **OCTOBER 28, 2005**.

In this action, the Center for Biological Diversity and certain individuals seek declaratory and injunctive relief against the National Marine Fisheries Service for unreasonable delay in the determination and designation of critical habitat for the right whale in the Pacific Ocean. Plaintiffs assert defendants' violations of the Endangered Species Act, 16 U.S.C. 1532

*et seq.*, and the Administrative Procedure Act, 5 U.S.C. 706(1) and (2). Relief is granted for the following reasons.[1]

## STATEMENT

### 1. RIGHT WHALE.

The right whale is the most endangered of all large whale species. A baleen whale, it has a thick body and a huge head that accounts for about one-third of its length. Adults range between 45 and 55 feet in length and weigh up to 70 tons. It has distinctive callosities on the head.

Right whales were once abundant throughout the Pacific and Atlantic. Prized for their oil and easy to catch, commercial whaling during the nineteenth century decimated the species. By 1935, they were so near extinction that the League of Nations convinced the whaling nations to stop hunting them; in 1949, with the passage of international whaling regulations, the Pacific population gained international protection. In the 1960's, however, right whales were still being poached in the Pacific. Today, right whales are injured by collisions with large vessels and net entanglement and by habitat degradation through pollution, sea-bed mining and oil-and-gas exploration. The Pacific population may now be as few as "tens of animals," as even NMFS now acknowledges (67 Fed. Reg. 7660, 7660 (2002)).

### 2. PROCEDURAL HISTORY.

The right whale was listed as an endangered species in 1971 (*id*. at 7661). In 1991, the NMFS issued the "Final Recovery Plan for the Northern Right Whale." The recovery plan called for the identification and protection by 1996 of "critical habitat(s)" — habitats essential to the survival and recovery of right whales in the Pacific Ocean (AR 18 at 79). The plan stated

---

[1] The scientific name of the right whale is the Northern Right Whale, *Eubalaena glacialis*. In 2003, NMFS published a Federal Register Notice that listed the Right Whale in the Pacific Ocean as a distinct species, *Eubalaena japonica*, *i.e.* as distinct from the Atlantic version (68 Fed. Reg. 17560-62 (2003)). In 2005, after plaintiffs filed this action, defendants announced that they were rescinding the 2003 action because NMFS had allegedly failed to meet procedural requirements. The notice further stated that the agency would conduct a status review to determine whether more than one species exists. At the hearing of this case, government counsel acknowledged that the separate listing would have triggered, at least arguably, an independent statutory duty to designate critical habitat in the Pacific Ocean. This order does not reach any such further issues. Rather, this order treats, as does the government, the right whale as a single species.

that the recovery plan team could not yet determine what habitat areas were critical to the survival of the right whales in the Pacific (*id.* at 47). Nevertheless, the recovery team recommended that once areas essential to the survival and recovery were identified in the Pacific, those areas should be protected under the Act (*id.* at 48). The plan gave a time-frame of five years (*i.e.*, until 1996) to identify critical habitat for right whales in the Pacific (*id.* at 79).

In 1994, the NMFS designated three "critical habitats" for right whales in the Atlantic (59 Fed. Reg. 28793, 28805 (1994)). No Pacific habitat was designated. Nor was any designated in 1996, as called for in the plan — or ever, which provoked this suit. In 2000, the CBD submitted a formal petition to NMFS to revise the critical habitat designation to include a zone off of the Alaskan coast. The petition identified areas concentrated in the middle shelf and inner front of the southeast Bering Sea to be designated as a critical habitat for the right whale in the Pacific Ocean. NMFS agreed that "the petition present[ed] substantial scientific information that the designation of a critical habitat may be warranted" and took the petition under consideration (66 Fed. Reg. 29773 (2001)).

In 2002, however, even after receiving many comments supporting designation, NMFS declined to designate any Pacific habitat. Despite "agree[ing] that designation of critical habitat may be a necessary component of any effort to conserve and recover" the right whale, NMFS concluded that the extent of the critical habitat could not be determined at that time because of alleged inadequate information (67 Fed. Reg. at 7662). Significantly, NMFS stated that "the most reasonable conclusion is that a smaller area than that petitioned may contain physical and biological features that are essential to the conservation of the species" (*id.* at 7664). Nonetheless, NMFS did not designate even the "smaller area" as critical habitat but said that it would continue to analyze the issues (*id.* at 7665). That was in 2002. Now in 2005, NMFS has yet to designate any critical habitat for the right whale in the entire Pacific Ocean. The 2002 notice further stated that a draft plan was expected to be available for comment later the same year for the Pacific right whale (*id.* at 7662). Although there have been multiple internal draft recovery plans for the right whales in the Pacific since 2002, no plan has been released.

**ANALYSIS**

Under the Endangered Species Act, when the Secretary lists a species as endangered, the Secretary is required to publish "concurrently" a final regulation designating critical habitat "to the maximum extent prudent" unless the Secretary determines that the critical habitat is not then "determinable" (§ 1533(a)(3)). ("The Secretary" refers to the Secretary of the Interior or the Secretary of Commerce, depending on the species; here it means the latter, who, in turn, has delegated the responsibility to NMFS.) If a habitat determination is not then possible, then the Secretary must publish a final critical habitat designation "to the maximum extent prudent" within one year following the listing (*ibid.*). The regulations give "not prudent" a very narrow meaning: "Not prudent" is defined as "not . . . beneficial to the species" or "increasing the degree of [takings] threat to a species" (50 C.F.R. 424.12(a)(1)(i)-(ii)).

Thereafter, any "interested person" may petition for a revision in the critical habitat (§ 1533(b)(3)(D)(i)). Within ninety days, the Secretary must "make a finding as to whether the petition presents substantial information indicating that the revision may be warranted" (*ibid.*). Upon a so-called "positive finding," the Secretary must then determine and publish "how he intends to proceed with the requested revision" within one year following the petition (§ 1533(b)(3)(D)(ii)). Specifically:

> Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

The standards governing critical habitat revisions are the same as for original designations (§ 1533(B)(2)):

> The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) of this section on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

4

1  To the "maximum extent prudent and determinable," the Secretary has an ongoing duty to
2  revise such designations "as appropriate" (§ 1533(a)(3)(A)).
3  In combined effect, these provisions inform the statutory phrase "how he intends to
4  proceed" in the habitat-revision paragraph. With respect to a petition for habitat revision, the
5  Secretary has these options: (i) publish a proposed rule revising the critical habitat or finding
6  that a statutory factor (*e.g.*, economic impact or national security) overrides the need for species
7  protection or (ii) find that revision of critical habitat is either not "prudent" or not
8  "determinable." The Secretary must chose one of the above and publish his intent within one
9  year of the petition.
10  The Act permits any person to commence a civil action against the Secretary "where
11  there is alleged a failure of the Secretary to perform any act or duty under
12  section 1533 . . . which is not discretionary with the Secretary" (§ 1540(g)(1)(C)). Under the
13  APA, an aggrieved person may sue to set aside final agency action that is arbitrary and
14  capricious and to compel an agency to act when it reasonably delays action. *Norton v. Utah*
15  *Wilderness Alliance,* 124 S. Ct. 2373, 2379–80 (2004); *Biodiversity Legal Foundation v.*
16  *Norton*, 285 F. Supp. 2d 1, 7–8 (D.D.C. 2003).
17          \*   \*   \*
18  In the present action, NMFS, acting as the Secretary's delegate, did, in fact, respond to
19  the petition by publishing "how [it] intends to proceed." The notice stated (in 2002) that NMFS
20  would study the problem (67 Fed. Reg. 7660). This was, in effect, a finding that a revision was
21  not "determinable" and a ruling that no Pacific habitat at all would be made at that time. No
22  suggestion was made that a designation would be imprudent.[2]

---

[2] Since the filing of this complaint, the agency has noticed that it will conduct a status review of the listing of the right whale in the Pacific and issue a final rule and any necessary critical habitat designation by 2006 (70 Fed. Reg. 1830, 1831 (2005)). The agency relies on this representation to attempt to side-step the entire "unreasonable delay" issue by arguing that because it is in the process of listing the Pacific population of right whales as a separate species and in doing so will designate critical habitat, the issues plaintiffs present are moot (Def. Cross-Mot. SJ at 8). This argument is not valid. For the last fourteen years the agency has said that it plans to designate critical habitat for the right whale in the Pacific and it has not – there is no reason to believe that the agency will now follow-through with promulgating the rule without judicial intervention.

5

1        The circumstances presented are very similar to those in *Biodiversity Legal Foundation v. Norton*, 285 F. Supp. 2d 1 (D.D.C. 2003) ("*BLF*").  There, Judge Rosemary M. Collyer held that the Secretary of Interior (through the Fish and Wildlife Service) had unreasonably withheld agency action in violation of the Administrative Procedure Act, 5 U.S.C. 555(b), 706(1).  There, the FWS had promulgated a statutory multi-species recovery plan calling for a revision and revision of a critical habitat designation based on distribution surveys.  This, Judge Collyer held, created a legal duty to revise the designation upon issuance of the plan.  By the time of the court decision in 2003, the delay had become four years.  That delay — plus the other considerations set forth in *In re International Chemical Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992) — led Judge Collyer to order relief.

         The present record presents an even stronger case for relief.  The right whale was listed as endangered 34 years ago, yet no Pacific habitat has ever been designated — despite the statutory duty to determine to revise (or not) critical habitat in a timely manner and the duty to act based on the best scientific data available.  *See BLF, 285* F. Supp. at 16; *Fund for Animals, Inc. v. Rice*, 85 F3d 535, 547 (11th Cir. 1996).  The surviving Pacific right whales are numbered "in the tens."  The 1991 recovery plan here committed the agency to "identifying and protecting as necessary habitat(s) essential to the survival and recovery of the North Pacific Right Whale" by 1996 (AR 18 at 79).  The plan stated that "North Pacific right whale habitats . . . and certain geographic areas are probably essential for meeting the biological requirements of the North Pacific right whales" (AR 18 at 51).  Although critical habitat was designed for the Atlantic in 1994, no critical habitat has ever been designated for the Pacific — then or now.  By the reasoning in *BLF*, NMFS has been overdue on the designation since at least 1996.  The delay here has thus been at least nine years, if not 34 years.

         Another consideration under *BLF* is the extent to which the delay has undermined the statutory scheme.  It is true that the Act places more priority on original designations than over later revisions.  Yet, again, it must be remembered that no Pacific habitat has yet been determined for 34 years.  The Pacific fleet of right whales is verging on extinction now, numbering "in the tens" by the agency's own admission (67 Fed. Reg. at 7660).  Without

United States District Court
For the Northern District of California

6

question, the delay has been severe in light of the statutory goal. *See Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687, 690 (1995). Indeed, the Act does not contemplate critical habitat as an afterthought in the preservation of a species; Congress considered the critical habitat designation an essential component of preservation of a species: "classifying a species as endangered or threatened is only the first step in insuring its survival. Of equal or more importance is the determination of the habitat necessary for the species' continued existence." H. R. Rep. No. 94–887, at 3 (1976).

Another *BLF* consideration is the consequence of further delay. Put differently, it is theoretically conceivable that right whales would be able to protect themselves in the face of more delay and/or that there are no imminent threats to them in the Pacific, such that more delay could be tolerated. For example, in the 1991 recovery plan, the agency surmised that natural conditions — such as extremely low abundance and scattered distribution rather than direct human interaction — posed the greatest threat to recovery of the right whales in the Pacific (AR 18 at 2). The administrative record, however, illustrates that over the last decade, increasing amounts of contaminants in the sea and the larger, faster, ocean-going fishing vessels that are being built are increasing the danger of collision and death for right whales in the Pacific. Given that there are a few precious right whales left in the Pacific and even fewer females, delay — of any length of time — brings the species closer to extinction.

Another *BLF* consideration is whether there are any difficulties faced by the agency in carrying out the congressional mandate. While the defendants do not raise this issue in their briefs, the administrative record illustrates that one of the difficulties faced by the agency in determining critical habitat is the impact a designation would have on commercial fishing and transportation businesses. As an example, in a memorandum regarding critical habitat, an Alaskan administrator writes "[f]urther actions to establish additional critical habitat for any species will likely be met with concern by the Alaskan Congressional delegation, the State of Alaska, and various private interests in particular the commercial fishing and transportation industries" (AR 39 at 5). While the Act directs the agency to analyze all impacts of critical habitat, including economic impact, the agency may not exclude an area from critical habitat if

1  it is determined that failure to designate that area as a critical habitat will result in extinction of
2  the species, as quoted above (*See also* 50 C.F.R. 424.19 (2004)).

3       A final factor makes this case an even stronger case for relief than in *BLF*. Here, the
4  agency has all but admitted that the record presented a case for at least designating a smaller
5  geographic region in the Pacific than that proposed by plaintiff — yet the agency designated no
6  critical habitat at all in the Pacific Ocean. In its final decision, the agency denied CBD's
7  petition yet stated that "[t]he most reasonable conclusion is that a much smaller area than that
8  petitioned may contain physical and biological features that are essential to the conservation of
9  the species, but information is insufficient to extrapolate that conclusion to the entire area
10 petitioned" (67 Fed. Reg. 7660, 7664). Furthermore, numerous correspondences in the
11 administrative record indicate the agency's willingness to designate critical habitat. For
12 example, a July 2003 agency memo reads "[we] are now prepared to go forward with a
13 Proposed Rule sometime this winter to designate some portion of the Bering Sea as a critical
14 habitat" (AR 467). The agency even drafted a proposed rule — although it was never published
15 for public comment (AR 412).

16      Congress instructed the agency to act on the basis of the "best scientific data available"
17 (§ 1533(b)(1)(A)). As the Ninth Circuit has said:

> The Endangered Species Act requires agencies to make determinations on the basis of the best scientific data available. Thus, a review of ESA case law provides insightful and analogous provisions and analysis. In *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988), this court held [*1071] that ***an agency's claim of insufficient information to prepare comprehensive biological opinions violated the ESA requirement that opinions use best data available***, and ordered the agency to comply with the ESA requirement. *See also Greenpeace v. Nat'l Marine Fisheries Serv.*, 55 F. Supp. 2d 1248, 1261–62 (W.D. Wash. 1999) (best scientific data available standard requires less than conclusive proof; Secretary must issue biological opinion); *Defenders of Wildlife v. Babbit*, 958 F. Supp. 670, 679–81 (D.D.C. 1997) (Secretary must determine whether any species is threatened or endangered using the best available evidence).

26 *Brower v. Evans*, 257 F.3d 1058, 1070-71 (9th Cir. 2001) (emphasis added).

27      Here, the best available evidence supports critical habitat designation. Beginning in
28 1996, small groups of right whales — including calves — were seen congregating, feeding and

1  engaging in courtship behavior in the southeast Bering Sea.  According to the Marine Mammal

2  Commission, (a federal body of marine mammal experts charged with making

3  recommendations to NMFS) concluded that (AR 44)

> the repeated occurrence of right whales in summer and fall months, coupled with the fact that the petitioned area lies within a broader area in which whaling records document that right whales were once abundant, provides a reasonable basis for concluding that the petitioned area contains physical or biological features essential for the species' survival.

Under the best available standard, Congress required the agency to consider the scientific information available *at the time* of consideration, giving the species the benefit of the doubt. *See e.g. Conner v. Buford*, 848 F.2d 1441, 1454 (9th Cir. 1998).

Congress did not contemplate paralysis while critical habitat issues were studied to death.  Congress wanted, "to the maximum extent prudent," prompt protection based on the "best scientific data available" so long as the data is adequate to make a "determination."  No critical habitat will ever be knowable with geographic exactitude.  The interwoven character of our ecology here on Earth bars that.  Our best approximations must do, at least so Congress concluded.  As stated by the Ninth Circuit in *Brower v. Evans*, 257 F.3d 1058, 1070 (2001), "scientific findings in marine mammal conservation are often necessarily made from incomplete or imperfect information."  The record presented to the agency seems clearly to have presented a strong case for designating at least the smaller zone referenced by the agency itself — yet the agency punted by calling for more study (67 Fed. Reg. 7664).

To be sure, the Act is controversial.  Economic interests, often with political influence, can be expected to resist efforts to designate critical habitat.  Congress took this into account.  It charged the Secretary, in making critical habitat designations, to consider "the economic impact, the impact on national security, and any other relevant impact."  The Secretary "may exclude any area from critical habitat if he determines that the benefits of exclusion outweigh the benefit of [inclusion] unless he determines, based on the best scientific and commercial data available, that the failure to [include] will result in the extinction of the species concerned."  Hard decisions are called for.  Commercial interests will legitimately prevail in some.  The species will legitimately prevail in others.  But Congress expected the hard decisions to be

made. Except where designations are simply not determinable, the agency must act based on the best evidence available to the maximum extent prudent.

NMFS had a statutory duty to make the hard decision, *i.e.*, to designate or not, unless it reasonably found the habitat was not determinable. The agency's conclusion that the issue was not "determinable" was not supported by administrative record and was arbitrary and capricious. The agency was legally obligated to make the hard decision based on the evidence available. The agency's failure to do so not only amounted to an unreasonable delay but was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law"(5 U.S.C. 706).[3]

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is **GRANTED** and defendant's cross motion for summary judgment is **DENIED**. It is unnecessary to reach any other issues raised.

1. This matter is **REMANDED** to NMFS with instructions to use the best available evidence to do one of the following two alternatives by **OCTOBER 28, 2005**:

    (a) Issue a proposed rule in the Federal Register designating an area of the Pacific Ocean as critical habitat for the right whale, or

    (b) Issue a Federal Register notice explaining why no Pacific critical habitat should be designated due to a more paramount statutory consideration (*e.g.*, commercial or national security interests), if the statutory standards can be met.

---

[3]Under the APA,

> any agency's action may be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that is could not be ascribed to a difference in view or the product of agency expertise.

*Brower*, 257 F.3d at 1065.

10

2. NMFS shall complete all rulemaking on the subject of the Pacific critical habitat for the right whale by **JUNE 30, 2006**.

3. NMFS shall designate an agency management official to carry out this remand order and to accept responsibility here in Court for failure to comply with this remand order. This designation must be filed by **JULY 15, 2005**.

4. NMFS shall file a progress report on compliance with this order on **SEPTEMBER 1, 2005**, and a further status conference shall be held on **SEPTEMBER 15, 2005**, at **11 A.M.**

5. The Court shall retain jurisdiction to enforce this order.

**IT IS SO ORDERED.**

Dated: June 14, 2005.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

11